21-1999-cr (L)
*United States v. McPartland, Spota*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term 2022

(Argued: October 20, 2022      Decided: August 25, 2023)

Nos. 21-1999-cr, 21-2004-cr

_____

UNITED STATES OF AMERICA

*Appellee,*

-v.-

CHRISTOPHER MCPARTLAND, THOMAS J. SPOTA,

*Defendants-Appellants.*

_____

Before:      LIVINGSTON, *Chief Judge*, NARDINI and MENASHI, *Circuit Judges*.

Defendants-Appellants Christopher McPartland and Thomas J. Spota appeal from their judgments of conviction in the United States District Court for the Eastern District of New York (Azrack, *J.*).  Following a five-week jury trial, Defendants-Appellants were convicted on counts of conspiracy to tamper with witnesses and obstruct an official proceeding, substantive witness tampering and obstruction of an official proceeding, obstruction of justice, and being accessories after the fact to the deprivation of the civil rights of a victim.  The district court

1

sentenced Defendants-Appellants, principally, to five years' imprisonment each. On appeal, Defendants-Appellants raise challenges to the district court's admission of certain testimony at trial—in particular, testimony about subordinates' fear of retaliation and testimony about bad acts that formed the basis for that fear of retaliation. Defendants-Appellants also challenge the district court's denial of their application to admit the government's bill of particulars, and McPartland challenges the district court's denial of his motion for an evidentiary hearing and new trial. We find Defendants-Appellants' arguments to be without merit. Accordingly, the judgment of the district court is AFFIRMED.

FOR APPELLEE:

JUSTINA GERACI, Assistant United States Attorney (Jo Ann M. Navickas, Nicole Boeckmann, and Michael Maffei, Assistant United States Attorneys, and Lara Treinis Gatz, Special Assistant United States Attorney, *on the brief*), *for* Breon Peace, United States Attorney for the Eastern District of New York, Brooklyn, NY.

FOR DEFENDANTS-APPELLANTS:

LARRY H. KRANTZ, Krantz & Berman LLP, New York, NY (Lisa Cahill, Krantz & Berman LLP, New York, NY; Bradley Gershel, Ballard Spahr LLP, New York, NY, *on the brief*), *for* Defendant-Appellant Christopher McPartland.

ALAN VINEGRAD, Covington & Burling LLP, New York, NY (Erin Monju, Covington & Burling LLP, New York, NY, *on the brief*), *for* Defendant-Appellant Thomas J. Spota.

DEBRA ANN LIVINGSTON, *Chief Judge*:

This is an appeal by two former prosecutors—Defendants-Appellants

Thomas J. Spota, previously the Suffolk County District Attorney, and Christopher

2

McPartland, previously the chief of the Government Corruption Bureau for the Suffolk County District Attorney's Office ("SCDAO")—who were convicted for their roles in covering up an assault carried out by James Burke, then the police chief for Suffolk County. After a five-week jury trial in the United States District Court for the Eastern District of New York (Azrack, *J.*), Spota and McPartland were found guilty of conspiracy to tamper with witnesses and obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k); substantive witness tampering and obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(b)(1), 1512(b)(2)(A), 1512(b)(3), and 1512(c)(2); obstruction of justice, in violation of 18 U.S.C. §§ 1503(a) and 1503(b)(3); and being accessories after the fact to the deprivation of the civil rights of the assault victim, Christopher Loeb, in violation of 18 U.S.C. § 3. On August 10, 2021, the district court entered judgment sentencing Spota and McPartland principally to five years' imprisonment each.

On appeal, Spota and McPartland argue that the district court improperly admitted what they characterize as irrelevant and inflammatory evidence—primarily, evidence that certain law enforcement officers feared retaliation if they were not complicit in the cover-up, as well as evidence of various bad acts carried out by Defendants-Appellants' co-conspirator, Burke. Spota and McPartland

3

also challenge the district court's denial of their application to admit the government's bill of particulars, and McPartland challenges the district court's denial of his Rule 33 motion, Fed. R. Crim. P. 33, for an evidentiary hearing and new trial. Because we conclude that the district court did not abuse its discretion in admitting the evidence of the officers' fear of retaliation, that any error in admitting the evidence relating to Burke was harmless, and that Spota and McPartland's other arguments are without merit, we affirm the judgment of the district court.

## BACKGROUND

### I.   Factual Background

In December 2012, Burke, the then–Chief of Department of the Suffolk County Police Department ("SCPD"), violently assaulted Loeb, who was at the time being held in an interrogation room in a police precinct. Loeb had been arrested after a search turned up evidence that he had been burglarizing cars—including, notably, a vehicle belonging to Burke, from which Loeb appeared to have taken several items. Three SCPD detectives in the Criminal Intelligence unit—Kenneth Bombace, Anthony Leto, and Michael Malone—interrogated Loeb. They yelled at, cursed, and slapped him, but could not extract a confession; Burke

4

himself then went into the interview room, where he fiercely punched, kicked, kneed, and screamed at Loeb, stopping only when the other officers intervened.

After the assault, Burke ordered other high-ranking members of the SCPD— including then-Lieutenant James Hickey, who led the Criminal Intelligence unit— to ensure that the rank-and-file detectives who had witnessed or participated in the assault would not reveal what had occurred. Burke also enlisted the help of his long-time friend and mentor, Spota, the District Attorney of Suffolk County, as well as McPartland, one of Spota's top prosecutors in the SCDAO, to help keep the witnesses quiet and to control the criminal case against Loeb.

In the spring of 2013, the U.S. Attorney's Office for the Eastern District of New York, with the assistance of the Federal Bureau of Investigation ("FBI"), opened a federal grand jury investigation into the assault. Burke, Spota, and McPartland responded by using the influence afforded by their positions, along with various threats of retaliation, to conceal Burke's crimes and to prevent witnesses from cooperating with the federal investigation. Thus, although the federal investigators served grand jury subpoenas in June 2013 on various potential witnesses—most notably, SCPD detectives Bombace and Leto—the investigation came up mostly dry. In December 2013, after determining that they

had insufficient evidence to pursue any charges, the U.S. Attorney's Office and the FBI closed the investigation.

But approximately one year later, the grand jury investigation was reinvigorated as certain key law enforcement witnesses—most notably Bombace, Leto, and Hickey—upon being immunized or entering into cooperation agreements, admitted to participating in the conspiracy and testified to Burke's conduct. Shortly thereafter, Burke was charged for his role in the assault and in the cover-up. In February 2016, he pleaded guilty to the charges and later was sentenced to 46 months' imprisonment. In October 2017, Spota and McPartland were indicted for their role in the conspiracy and charged with four counts: conspiracy to tamper with witnesses and obstruct an official proceeding, substantive witness tampering and obstruction of an official proceeding, obstruction of justice, and being accessories after the fact to the deprivation of Loeb's civil rights.

## II.    The Trial

Spota and McPartland's trial commenced on November 14, 2019. Over the course of five weeks, the government presented evidence, including hundreds of exhibits and the testimony of dozens of witnesses, supporting the charges that

Spota and McPartland, together with others, carried out a concerted plan, which involved both witness tampering and the obstruction of the federal grand jury investigation, to cover up Burke's assault on Loeb. Central to the government's case was the testimony of Hickey, who spoke directly to the key roles of Spota and McPartland in the conspiracy, along with the testimony of Bombace and Leto, who discussed the pressures they were under to carry out Spota and McPartland's desired ends.

## A. The "Inner Circle"

As the government elicited at trial, Spota and Burke had a relationship that was widely known in the Suffolk County law enforcement community to be extremely close. They had been "close friends for over 40 years" and "Spota was Burke's fiercest defender and protector." MA-1130.[1] Similarly, McPartland and Burke were characterized as having a close personal and professional relationship, with one witness describing them as "best friends" and saying that McPartland "would be the first person that Burke would turn to when he was in trouble." *Id.* Spota, Burke, and McPartland referred to themselves as "the administration."

---

[1] Citations in the format of "MA-__" and "SA-__" are to the Appendix of Defendant-Appellant Christopher McPartland and Appendix of Defendant-Appellant Thomas Spota, respectively. Citations to "SPA-__" are to the Special Appendix of Defendant-Appellant Thomas Spota.

7

MA-1141 to -42.    And, according to the testimony elicited at trial, "the administration" had a reputation for being tightly knit and vindictive—"[a]n enemy of one [was] an enemy of all" and could expect to "face dire consequences." MA-1132, MA-1135.

The three also had a slightly larger clique—this one comprised of themselves, Hickey, and William Madigan, the Chief of Detectives of the SCPD—which they called "the inner circle."    MA-1129 to -30.    Like "the administration," the inner circle was built on a combination of loyalty and vindictiveness.    Indeed, according to his testimony, Hickey joined the inner circle in 2005 through an incident targeting an "enemy" of Burke's, Patrick Cuff.

As Cuff himself testified, he first appeared on Burke's blacklist following an incident in 1993, when Cuff was a lieutenant in the SCPD's Internal Affairs Bureau. At that time, the Internal Affairs Bureau was investigating Burke for his alleged sexual relationship with Lowrita Rickenbacker, a woman with a prior felony conviction who was known to be actively engaged in criminal conduct, including possession and sale of illegal drugs, prostitution, and larceny.    As part of the investigation, Cuff interviewed Burke.    During the interview, Cuff, as he

8

acknowledged at trial, "chuckled" at Burke's description of his own reputation as "sterling," earning Burke's ire. MA-1563.

Hickey's "induction" into the inner circle came over a decade later. In September 2005, he encountered Cuff—who was now an inspector in the SCPD—deeply upset because his son had been arrested for possession of a service weapon and he believed the SCDAO had moved to upgrade the misdemeanor charge to a felony. Upon seeing Cuff upset, Hickey called Burke to tell him, and heard Burke in turn call Spota and McPartland into the room so Hickey could relay the information to them as well. Hickey explained at trial that he called Burke because he knew Burke hated Cuff, and he believed that telling Burke would "ingratiate" him with the administration. MA-1407. And it indeed appeared to do so—six or seven weeks later, Hickey was, in his telling, "suddenly promoted" to commanding officer of the Criminal Intelligence unit. *Id.* To Hickey the lesson of this incident was clear—that friends of Burke's "administration" would be rewarded, and enemies punished.

Once "inducted," and after Burke's promotion to Chief of Department, Hickey acted as a liaison between the inner circle and his detectives in the Criminal Intelligence unit, specifically the four who comprised the "palace guards"—

9

Bombace, Leto, Malone, and Cliff Lent. MA-1156. The detectives frequently carried out tasks, both personal and work-related, for Burke. In one instance, Leto tailed the stepson of Burke's girlfriend, who had been giving her trouble, hoping to catch him breaking the law. In another, Burke had two detectives sent to confront his girlfriend's contractor. Aware of Burke's disagreements with a colleague in the SCPD, Bombace was ordered to serve as a "lookout" while another friend of Burke's, Sanjiv Panchal, removed a GPS tracking device Panchal had previously placed on the colleague's vehicle. Leto also testified to "spying on" county executive Steve Bellone and reporting back to Hickey about whom Bellone was meeting with. MA-772. These orders often came to them from Hickey; they knew the information they reported was being passed up the chain to Burke; and the "palace guards . . . would do anything and everything that the king, Burke, would ask them to do." MA-1156.

### B. Loeb's Interrogation and the Immediate Aftermath

Several witnesses at the trial provided testimony regarding the events leading up to and including the assault of Loeb on December 14, 2012. As relevant here, on that morning, Burke had reported that his SCPD-issued vehicle had been broken into and various items were stolen, including a "party bag"

10

containing, among other things, dildos, condoms, pornography, and Viagra. MA-338, MA-499 to -502.

Although the Criminal Intelligence unit would not normally be involved with a vehicle break-in, at Burke's request, Hickey assigned a number of his detectives to investigate. After initially reporting to Burke's house to canvass the scene, detectives Bombace, Leto, and Malone were directed to report to the Fourth Precinct, where Loeb and another burglary suspect were in custody.

As Leto testified at trial, the detectives felt pressure to secure a confession from Loeb, as he had burglarized "the chief's" car—but their attempts were unsuccessful. MA-775 to -76. It was at this point that Burke arrived at the Fourth Precinct and became "upset" when told that Loeb had not confessed. MA-777. Burke then entered the interview room to confront Loeb, and after a brief exchange in which Loeb called Burke a "pervert," Burke began violently assaulting Loeb—punching him in the head and body as Loeb was handcuffed to the floor, grabbing Loeb's ears, and shaking and kneeing the detainee. MA-776 to -77. Burke desisted only when the detectives physically pulled him away.

Following the assault, the SCDAO proceeded with its prosecution of Loeb for the vehicle break-ins and thefts. Initially, the prosecution was overseen by

11

McPartland, then the Chief of the Government Corruption Bureau, even though car thefts would not normally be within his bureau's purview. Burke told Hickey that McPartland was handling the case so as to "take care of it for us." MA-1166. But Loeb subsequently went public with his allegations of being assaulted in police custody. As a result, Spota faced considerable pressure around February 2013 to transfer the case to a special prosecutor, which he ultimately did. When a special prosecutor was appointed from the Queens District Attorney's Office, Spota and McPartland initially expressed that they were "very pleased" given their "very friendly" relationship with that office. MA-1199. Even still, Spota and McPartland asked Madigan to serve as a liaison between the special prosecutor and the police department, monitoring all interactions and "report[ing] back." MA-1199 to -203; *see also* MA-563 to -64, MA-616.

## C. The Cover-Up

Hickey testified that, in fact, Burke, Spota, and McPartland reacted to the public allegations with panic. McPartland "immediately reach[ed] out [to Hickey], discussing the need for . . . [Hickey] to keep [his] guys quiet and tight" and telling him "that to keep Jimmy out of jail, . . . we need[] to keep the guys quiet and in line." MA-1187 to -88. Spota also spoke with Hickey during this period,

12

inquiring whether the detectives were "towing [sic] the line." MA-1187. Hickey recalled meeting with Burke and McPartland in February 2013 to discuss potential explanations for Burke's presence at the police station on the day of the assault. During this meeting, Burke proposed various explanations, "and McPartland would okay [them] or not." MA-1192. Ultimately Burke proposed saying that "he just popped his head in," and McPartland approved of this explanation by nodding his head. MA-1191 to -95.

There were "constant" inquiries from both Spota and McPartland during this time as to whether Hickey, as commanding officer of the Criminal Intelligence unit, could ensure that his men were "doing okay"—that they would "stay with the story and not tell the truth," rather than "chang[e] their tune." MA-1195 to -96. This would become a common refrain. Hickey recounted that "[e]very single time [he] saw Spota . . . [or] McPartland, in passing, in a meeting, on the phone, they would inquire, how are your men? How are the guys? How are they doing?" MA-1195. Hickey would then ask his detectives if everyone was "holding tight" and "good," and report "back up the chain of command." MA-1196 to -97. "[I]t was . . . a daily, nonstop, constant pressure [on Hickey] . . . to keep track of [his] men and to report back up the chain." MA-1205.

13

Bombace and Leto also testified at trial about the cover-up from their perspective. Leto explained that after the appointment of the special prosecutor, Bombace, Leto, and Malone met with Hickey, who informed them of the appointment and told them "what [their] story was going to be . . . [if] the special prosecutor asked . . . about if [Burke] went into the room with Christopher Loeb." MA-782. The detectives subsequently met with Burke himself, who told them that he "might have poked [his] head" into the interview room, which Bombace and Leto both testified to having understood to signify that this was the account they should give the special prosecutor. MA-557 to -58, MA-783.

On June 25, 2013, Bombace and Leto received grand jury subpoenas as part of the federal investigation. On the same day, they informed Hickey that they had been served with subpoenas "[s]o that he would know that . . . [they] were . . . not going to rat out" and "[s]o he would pass it up the chain to Burke and everybody else"—including Spota. MA-784 to -85. Hickey, after failing to get in contact with Burke, called McPartland, who told him to "get [his] guys together," "find out exactly what was said to them by the agents serving the grand jury subpoenas," and "to report back [his] findings." MA-1211 to -12. Hickey then met with his detectives, whom Hickey described as "extremely nervous,"

14

"scared," and "very apprehensive." MA-1213 to -14. That day, Burke met with Spota, McPartland, Madigan, and Emily Constant, who as Chief Assistant District Attorney was essentially the "number two" person in the SCDAO, at Spota's home, where they discussed the subpoenas and the federal investigation. Burke later told Hickey that keeping his detectives quiet was Hickey's new "full-time job," MA-1218 to -19, and that his "only job was to keep [Burke] alive, to keep [his] guys calm, to keep them from ratting, to let them know if there was [sic] any changes," MA-1230.

In September 2013, ahead of a state court hearing related to the Loeb prosecution, Hickey, Burke, and McPartland met to prepare Burke, should he have to testify in the hearing, and to discuss which of Hickey's detectives could testify in the alternative.[2] Burke and McPartland settled on Leto, because they perceived that he would be the most reliable. When Hickey commented that Leto was "not going to like it," Burke became angry, observing that "this is what they signed up for. They want to make the most money, drive the nicest cars, have the nicest job, this is what they signed up for." MA-1245. Leto—who was

---

[2] By this point, according to Hickey, Burke had repeatedly and openly acknowledged beating Loeb in conversations with both Spota and McPartland at which Hickey was also present. MA-1244.

15

separately tapped by the special prosecutor to testify—was upset and didn't want to testify. But he nevertheless gave false testimony about what had happened on the day of Loeb's arrest, denying that an assault had occurred.

Bombace and Leto both admitted at trial that they lied to the special prosecutor when they parroted Burke's false story that he had merely popped his head in during Loeb's interrogation. MA-558, MA-790. Bombace likewise admitted to lying to the FBI during the federal investigation, denying that Burke had beaten Loeb. MA-561. When asked about their decision not to testify truthfully, both Bombace and Leto explained that they feared retaliation by Burke and his associates. For example, Leto explained that he feared his sons would be set up or falsely accused of a crime if he were to testify against Burke, specifically noting Burke's "powerful friends," Spota and McPartland. MA-774, MA-786. Similarly, Bombace explained his fear that if he and Leto "told the truth, that [they] would be retaliated against, even with as much as a . . . targeted criminal prosecution." MA-558.

Hickey's testimony hit on the same themes. When asked if he "[felt] like [he] had any choice in the matter in terms of [his] role," Hickey replied, "Absolutely not." Specifically, he testified, "If I went against Burke, Spota or

16

McPartland, especially as someone that's part of the inner circle . . . I'd be dead. I'd be finished. I would be public enemy number one." MA-1205 to -06. Hickey—along with several other witnesses, including Leto—observed that, when Burke was named Chief of Department of the SCPD in 2012, he promptly demoted Cuff the maximum possible four ranks, after which Spota, McPartland, Burke, Hickey, and Madigan held a "demotion party."

In December 2013, Burke was notified by an FBI agent involved with the federal investigation of the assault on Loeb that the investigation was being closed—and Burke was cleared. Hickey testified that Burke was "elated" and boasted that this is "what happens when you just hold tight." MA-1252. Spota indicated to Hickey that his men had done "great," while McPartland congratulated Hickey for a good job. MA-1253.

### D. The Federal Investigation Reopens

The administration's success, however, was only temporary. In September 2014, Hickey learned that two Suffolk County detectives serving on the FBI gang task force had been asked to leave a proffer session in the Central Islip federal courthouse, prompting concern among the co-conspirators that the federal investigation had recommenced. Hickey located Burke, who immediately called

17

McPartland and placed him on speaker phone. McPartland first speculated that Bombace had decided to cooperate, before telling Hickey that he "need[ed] to take the temperature of [his] guys, find out what's going on, and make sure that they're all quiet." MA-1265 to -66. That day, Spota also asked Hickey if his "guys [were] holding tight," and whether "it look[ed] like any of them are cooperating or looking to cooperate." MA-1268. By this time Burke was "extremely, extremely concerned," and advised Hickey that he should make sure that he wasn't being followed and that his conversations were not being intercepted. MA-1266, MA-1269.

In early June 2015, Bombace informed Hickey that his attorney had heard from the U.S. Attorney's Office that the federal investigation into Loeb's assault had been reopened and that subpoenas would be forthcoming. Hickey testified that he informed Burke, who insisted they meet with Spota and McPartland the next day to explain the situation.

Spota, McPartland, Burke, and Hickey discussed next steps and who might be cooperating with the FBI. According to Hickey's testimony, after Hickey suggested that Bombace may have been the one who "flipped," Spota responded by saying "these guys can't change their testimony now," remarking further that

18

he would see to it that Bombace would never work in Suffolk County again if he cooperated. MA-1290 to -92. McPartland told Hickey to "find out if anyone's talking, if anyone's cooperating, and, if so, we will take immediate steps to discredit them." MA-1292. Burke, addressing Spota, said, "Tommy, can you believe this? Can you believe that the feds are going to try to put me in jail for tapping some junkie thief on the top of his head?" MA-1292. Spota then reminded the group to be "careful for bugs and wiretaps." MA-1293.

At the end of the meeting, as Hickey started to leave, Burke told Hickey to remind his detectives of "what happens when you go against the administration." MA-1309 to -10. According to Hickey, McPartland then added, "just ask John Oliva." MA-1293.

The government elicited testimony from Hickey and others explaining McPartland's reference to John Oliva, a former SCPD detective. Back in 2014, McPartland, with Spota's authorization, obtained a warrant to wiretap Oliva after concluding that he was the likely source of unflattering leaks to a particular *Newsday* reporter who had authored articles critical of Burke. Spota and McPartland were both active in monitoring the wire, which eventually captured Oliva leaking information, a possible felony offense. In September 2014, Oliva

19

was arrested and pleaded guilty to a misdemeanor for official misconduct. By referencing these recent events in discussing potential defectors among Hickey's detectives, McPartland made his intentions clear—Spota and McPartland were not afraid to use the resources of their office to punish an enemy.

Burke's girlfriend, Barbara Craft, testified that throughout the summer of 2015, Burke was on the phone with McPartland discussing the Loeb investigation and expressing concern that Hickey and his detectives were talking about him. Hickey testified that in August, after hearing from Bombace again about the building federal investigation, Hickey met with Burke and McPartland; there McPartland accused Hickey of having "lost control" of Bombace, whom he called a "rat." MA-1314, MA-1318 to -19.

According to Hickey's testimony, Burke, Spota, and McPartland continued to pressure Hickey to maintain the cover-up throughout the summer of 2015 and into the fall. For a time, Hickey remained resolved, but the stress and anxiety from the cover-up continued to mount. Hickey experienced, among other things, hallucinations, memory loss, and confusion, eventually leading to his hospitalization in October 2015. A week after his hospital stay, Hickey himself was served with a federal grand jury subpoena. Shortly thereafter, Hickey hired

an attorney and began cooperating with law enforcement authorities, thus permitting the full scope of Burke, Spota, and McPartland's cover-up to come to light.

### E.  The Defense and Rebuttal Cases

After the government rested, Spota and McPartland each proffered stipulations and related exhibits but called no additional witnesses in their respective defenses.[3]   In rebuttal, the government called a witness to clarify an issue raised by the defense, relating to certain swipe card records of Spota's and Hickey's entries into the two buildings that housed the SCDAO during the relevant period.   The parties then offered their summations.

### F.  The Verdict

The trial concluded on December 17, 2019, with the jury convicting both Spota and McPartland on all four counts in the indictment.

---

[3] Constant, the former Chief Assistant District Attorney at the SCDAO, had testified earlier in the trial as a defense witness after being first called by the government. As a defense witness, her testimony called into question a number of aspects of the government's case.   For example, she testified to having had two conversations with Spota that suggested he did not know about either the Loeb assault or its cover-up until October 2015.   She also testified that relations between Burke and Spota had cooled by 2012, making cooperation between them less likely, and that Spota had legitimate concerns motivating his authorization of the Oliva wiretap.

### III.    Subsequent Procedural History

On February 27, 2020, McPartland moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure and requested an evidentiary hearing in support of that motion.    The district court denied the motion.

On August 10, 2021, Spota and McPartland were each sentenced, principally, to five years' imprisonment.    This appeal followed.

## DISCUSSION

On appeal, Spota and McPartland contend the district court erred in three respects: (1) its admission of evidence relating to the state of mind of the law enforcement officers who participated in the cover-up, Burke's prior bad acts, and the bag stolen from Burke's vehicle; (2) its denial of Defendants-Appellants' application to admit the government's bill of particulars; and, only on behalf of McPartland, (3) its denial of McPartland's Rule 33 motion for an evidentiary hearing and new trial.    We address each argument in turn.

### I.    Evidentiary Challenges

We review a district court's evidentiary rulings for abuse of discretion and "will disturb an evidentiary ruling only where the decision to admit or exclude evidence was manifestly erroneous."    *United States v. Litvak*, 889 F.3d 56, 67 (2d

Cir. 2018) (internal quotation marks omitted).   "Even if a decision was manifestly erroneous, we will affirm if the error was harmless."   *Id.* (internal quotation marks omitted).

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" where "the fact is of consequence in determining the action."   Fed. R. Evid. 401.   A district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   Fed. R. Evid. 403.

"We accord great deference to a district court in ruling as to the relevancy and unfair prejudice of proffered evidence, mindful that it sees the witnesses, the parties, the jurors, and the attorneys, and is thus in a superior position to evaluate the likely impact of the evidence."   *United States v. Paulino*, 445 F.3d 211, 217 (2d Cir. 2006) (internal quotation marks omitted).   When reviewing a district court's Rule 403 determination, we "generally maximize [the evidence's] probative value and minimize its prejudicial effect."   *United States v. LaFlam*, 369 F.3d 153, 155 (2d Cir. 2004) (internal quotation marks and alterations omitted).

Rule 404(b) governs the admissibility of evidence of "other acts"—"crimes, wrongs, or acts" other than those charged in the indictment. Fed. R. Evid. 404(b).[4] Such evidence is not admissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but it may be admitted "for another purpose." Fed. R. Evid. 404(b)(1), (2). This Court "has adopted an inclusionary approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity." *LaFlam*, 369 F.3d at 156 (internal quotation marks omitted). For example, evidence of uncharged criminal conduct that "is inextricably intertwined with the evidence regarding the charged offense . . . [or] necessary to complete the story of the crime at trial" is not typically excluded under Rule 404(b). *United States v. Robinson*, 702 F.3d 22, 37 (2d Cir. 2012) (internal quotation marks omitted). "To determine whether a district court

---

[4] The 2020 Amendment to Rule 404(b), effective December 1, 2020, imposes new notice requirements on the prosecution in a criminal case. *See* Fed. R. Evid. 404(b) advisory committee's note to 2020 amendment. Pursuant to Rule 404(b)(3), the prosecution must generally provide the defendant with pretrial notice "in writing" that "identif[ies] the evidence that it intends to offer pursuant to the rule" and "articulate[s] a non-propensity purpose for which the evidence is offered and the basis for concluding that the evidence is relevant in light of this purpose." *Id.* This notice must be provided "in such time as to allow the defendant a fair opportunity to meet the evidence." *Id.* Because Spota and McPartland's trial occurred prior to December 1, 2020, the provisions of this amendment are not implicated here.

properly admitted other act evidence, the reviewing court considers whether (1) it was offered for a proper purpose; (2) it was relevant to a material issue in dispute; (3) its probative value is substantially outweighed by its prejudicial effect; and (4) the trial court gave an appropriate limiting instruction to the jury if so requested by the defendant."   *LaFlam*, 369 F.3d at 156.

## A. Fear-of-Retaliation Testimony

Spota and McPartland first contend the admission of testimony explaining that the officers participated in the cover-up out of a fear of retaliation was in violation of Rules 401, 403, 602, 701, and 404(b) of the Federal Rules of Evidence. We disagree.

To begin, we discern no arbitrariness or irrationality in the district court's determination that the fear-of-retaliation testimony was relevant "to explain the actions of the coconspirators [*i.e.*, the officers] and to complete the story of the charged conspiracy."   SPA-3; *see also* MA-244 to -46, MA-250 to -52.[5]   Evidence of a co-conspirator's state of mind may be relevant "to explain how a criminal

---

[5] The district court issued a written order, dated November 9, 2019, permitting the introduction of, among other things, the fear-of-retaliation testimony, the Oliva wiretap and prosecution, the Cuff incidents, and the Rickenbacker investigation.   *See* SPA-1 to -9.   This order was issued after the parties submitted various motions *in limine* relating to these categories of evidence.

[enterprise] developed," "to help the jury understand the basis for the co-conspirators' relationship of mutual trust," *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996), or "to complete the story of the crime on trial," *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997) (internal quotation marks and alteration omitted). Here, without this testimony, the jury would have lacked a complete picture as to why the officers chose to participate in the cover-up, despite the stress and criminal penalties to which participation in a years-long cover-up would expose them. Moreover, the officers' fear of retaliation, along with their understanding of the administration's willingness to operate corruptly, was necessary to explain why the officers interpreted the occasionally cryptic statements by Burke, Spota, and McPartland as instructions to lie—such as when Burke told Bombace and Leto that he "might have poked [his] head" into the interview room. MA-557 to -58; *see United States v. Simels*, 654 F.3d 161, 168 (2d Cir. 2011) ("[Testimony regarding prior] witness intimidation activities . . . of which [the defendant] was likely aware . . . was admissible to provide a basis for [the witness] (and the jury) to understand the full import of many of [the defendant's] statements to [the witness]."). Given that the testimony of Hickey, Bombace, and Leto was critical to the government's case, their explanations

26

regarding how Burke, Spota, and McPartland operated the conspiracy through fear of reprisal provided important context for the jury. Accordingly, we reject Spota and McPartland's relevancy challenge.

Moreover, we disagree with Spota and McPartland's contention that the government's use of the fear-of-retaliation testimony improperly served to establish the truth of the officers' beliefs. The government's statements in summation, such as that "[r]etaliation is sure to follow" those who cross Burke, Spota, and McPartland, MA-1937, were said in the context of the court's limiting instruction that the evidence—particularly the testimony relating to specific, purportedly retaliatory actions taken by Burke, Spota, or McPartland—was to be used only to consider the state of mind of the witnesses. In light of the highly probative nature of the evidence at issue, this limiting instruction was sufficient to prevent improper use of the testimony. *See United States v. Reichberg*, 5 F.4th 233, 244 (2d Cir. 2021) ("We presume that juries follow limiting instructions . . . ." (internal quotation marks and alteration omitted)). We thus reject Spota and McPartland's argument that the fear-of-retaliation testimony was misused in a manner that created unfair prejudice, and we conclude that their challenge to this testimony under Rule 403 is without merit.

27

Spota and McPartland also challenge the testimony under Rules 602 and 701, which require, respectively, that a lay witness testify only to matters within his or her "personal knowledge," Fed. R. Evid. 602, and offer opinion testimony based only on the "the witness's perception," Fed. R. Evid. 701(a). Defendants-Appellants note that, besides Hickey, the officers who related their fears of retaliatory conduct did not testify to having actually spoken to either Spota or McPartland about the Loeb affair, nor did they testify that Hickey ever communicated any direct threats from Spota or McPartland to them.

On review, however, we disagree with Spota and McPartland's contention that the fear-of-retaliation testimony was "sheer speculation" and "entirely based on [the officers'] imaginations." Br. of Appellant McPartland at 46–47. Bombace and Leto need not have spoken directly to Defendants-Appellants about the Loeb assault and cover-up in order to have personal knowledge that there was a possibility of retaliation by "the administration." Rather, an officer could perceive a possibility of retaliation—and fear that retaliation would happen— simply from working in the SCPD and experiencing the department's culture, as Hickey, Bombace, and Leto all invariably did. *See United States v. Cuti*, 720 F.3d 453, 458–59 (2d Cir. 2013) ("[P]ersonal knowledge of a fact is not an absolute to

28

Rule 602's foundational requirement, which may consist of what the witness thinks he knows from personal perception." (internal quotation marks omitted)). Accordingly, we conclude that the district court did not abuse its discretion in admitting this evidence under Rules 602 and 701.

Finally, McPartland argues that the testimony about fear of retaliation—referring to the officers' testimony describing their fears, as opposed to their testimony regarding the specific instances that informed those fears—was admitted as "backdoor propensity evidence" in violation of Rule 404(b).[6] Br. of Appellant McPartland at 44. On this point, we are unpersuaded.

Simply put, the officers' fear-of-retaliation testimony does not constitute "other crimes, wrongs, or acts" that fall under Rule 404(b).[7] The testimony is comprised of the officers' statements about what they thought Burke, Spota, and McPartland might do if they did not cooperate in the cover-up. Although this testimony may paint Spota and McPartland in a bad light, it is not evidence of other crimes, wrongs, or acts within the meaning of Rule 404(b)—the officers'

---

[6] Spota argues that the fear-of-retaliation testimony was inadmissible under Rules 401, 403, 602, and 701—but he does not argue that the district court's admission of the fear-of-retaliation testimony violated Rule 404(b). *See* Br. of Appellant Spota at 52.

[7] To the extent the fear-of-retaliation testimony dovetails with the evidence of specific incidents of retaliation, we discuss the application of Rule 404(b) in the following sections.

statements were merely lay opinion testimony that, as the district court stated, reveals the state of mind of the officers. Accordingly, we conclude that McPartland does not present a colorable argument under Rule 404(b), and that the fear-of-retaliation testimony was properly admitted.

## B. The Oliva Wiretap and Prosecution

Spota and McPartland next argue that the district court's decision to admit evidence of the Oliva wiretap and prosecution was in violation of Rules 401, 403, and 404(b) of the Federal Rules of Evidence because, among other things, the wiretap was lawful and some testimony, such as a discussion of profane text messages, led to unfair prejudice that outweighed the probative value of the testimony. We find these arguments to be without merit.

Here, we discern no abuse of discretion in the district court's finding that the Oliva evidence was "inextricably intertwined" with the charged offenses and therefore outside the scope of Rule 404(b)(1)'s prohibition. SPA-5. According to Hickey's testimony, when he met with Burke, Spota, and McPartland in June 2015 to discuss the reopening of the federal investigation, McPartland pointedly said, "just ask John Oliva," after Burke reminded Hickey of what happens to those who "go against the administration." MA-1397. This statement—a threat to

30

any officers who were considering cooperating with the investigation—directly bears on whether McPartland committed the charged crimes.   But to understand the reference to Oliva, it was necessary that the jury hear evidence about the Oliva wiretap and prosecution.   Thus, this evidence was properly admitted, not to prove anything about the defendants' character (much less to show that any of their specific actions were in accordance with that character), but rather to make sensible to the jury key evidence of the charged offense.

Additionally, we discern no abuse of discretion in the district court's assessment of the Oliva evidence under Rule 403.   It reasonably found that the evidence of the Oliva wiretap and prosecution was highly probative because it provided context for other relevant evidence—namely, the alleged threat by McPartland—and it involved conduct "not . . . any more sensational or disturbing than the crimes with which [the defendants were] charged."   *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).   Further, the district court's limiting instruction, which reminded the jury that the Oliva wiretap and prosecution were lawful, served to lessen any prejudicial effect of the evidence—as did the district court's instruction that the evidence "was admitted for only limited purposes" relating to understanding the relationships and motivations of

31

Defendants-Appellants and their co-coconspirators. SA-512. Accordingly, we affirm the district court's decision to admit the Oliva evidence.

### C. The Prosecution of Cuff's Son and the Rickenbacker Investigation

Spota and McPartland next contend that the district court's decision to admit evidence related to the prosecution of Cuff's son and the 1993 investigation into Burke's relationship with Lowrita Rickenbacker was in violation of Rules 401, 403, and 404(b).[8] Defendants-Appellants argue that the district court improperly permitted a number of witnesses to testify about the charges against Cuff's son, even though only Hickey's testimony suggested any wrongdoing by Spota and McPartland in connection with those charges. They also argue that the court erred in allowing multiple witnesses to discuss Burke's relationship with Rickenbacker, including testimony that he had sexual relations in his police cruiser, as well as affairs with other prostitutes.

---

[8] Spota and McPartland also purport to challenge the admissibility of this evidence under Rule 802, the rule against hearsay. Their arguments simply state that certain testimony was hearsay, without further explanation. *See, e.g.*, Br. of Appellant Spota at 42 (alleging that Hickey's testimony that he knew Spota was responsible for the upgraded charge against Cuff's son was "a baseless assertion, grounded in hearsay"); *id.* at 43 (stating that "granular details" about Burke's affair with Rickenbacker were "introduced through lengthy hearsay"). As Spota and McPartland do not make any meaningful arguments on hearsay grounds, we do not consider whether the testimony at trial consisted of improperly admitted hearsay.

Again, we disagree that the evidence was inadmissible. First, we agree with the district court that the evidence about Hickey's and Cuff's beliefs that the charge against Cuff's son was to be upgraded was necessary "to complete the story of the charged conspiracy." SPA-6. The account of the upgraded charge against Cuff's son explains Hickey's introduction to the inner circle, which in turn provides context for his role as the liaison between "the administration" and the Criminal Intelligence detectives. Without understanding Hickey's place in the inner circle—including the loyalty to Burke that Hickey demonstrated in order to earn that place—the jury could not have understood why Hickey was entrusted with the all-important responsibility of keeping his detectives in line, but was at the same time subject to threats and pressure from Burke, Spota, and McPartland. As such, this is the sort of evidence "to explain the mutual trust that existed between coconspirators" that "[w]e have held repeatedly [to be] within the court's discretion to admit." *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993); *see also United States v. Williams*, 205 F.3d 23, 33–34 (2d Cir. 2000) ("[E]vidence of [the defendant's] prior criminal conduct with his co-conspirators was relevant . . . to help explain to the jury how the illegal relationship between the participants in the crime developed." (internal quotation marks omitted)).

33

We also conclude that the district court did not abuse its discretion in finding that the risk of unfair prejudice from this evidence was not substantially outweighed by its probative value. *See* Fed. R. Evid. 403. Hickey's and Cuff's beliefs that the charge would be upgraded, and the fact that Hickey relayed Cuff's distress to Burke, Spota, and McPartland, provided highly probative context about the administration and the inner circle. Meanwhile, any prejudicial effect against Spota and McPartland, based on either Hickey's belief that they upgraded the charge or their participation in the discussion of Cuff, was lessened by the district court's limiting instructions informing the jury of the legality of the prosecution of Cuff's son and the limited purposes for which this evidence was admitted. *See* SA-512. Additionally, we discern no abuse of discretion in the district court's determination that the evidence about the prosecution of Cuff's son, which was a lawful exercise of the SCDAO's discretion, was "not more sensational or disturbing" than the obstruction charges against Spota and McPartland. SPA-6; *see Williams*, 205 F.3d at 34 (finding "no undue prejudice" in admitting evidence of prior criminal conduct where "the evidence did not involve conduct more serious than the charged crime and the district court gave a proper limiting instruction").

34

Evidence of the Rickenbacker investigation, meanwhile, was necessary to understand why Hickey's phone call to Burke after learning about Cuff's concern that his son would be indicted for a felony was meaningful enough to earn Hickey a place in the inner circle. As such, it too was necessary to complete the story of the charged conspiracy. Accordingly, the testimony regarding the Rickenbacker investigation was not improperly admitted as evidence of "other crimes, wrongs, or acts" under Rule 404(b). *See Robinson*, 702 F.3d at 37.

We also conclude that the district court did not abuse its discretion in determining that the evidence about the Rickenbacker investigation was "critical to understand[ing] Burke's hatred of Cuff," and therefore more probative than unfairly prejudicial. SPA-6 to -7, -10. The only direct relation between this evidence and Defendants-Appellants was the testimony that Spota represented Burke in the investigation, but the district court's limiting instruction that the representation was legal and ethical served to lessen any prejudicial effect against Spota. *See* SA-511. As such, we affirm as to the district court's admission of this evidence.

**D. The Remaining Cuff Incidents and Burke's Other "Bad Acts"**

Finally, Spota and McPartland challenge the district court's admission of testimony regarding the "party bag" stolen from Burke's vehicle and Loeb's subsequent reference to Burke as a "pervert"; the assorted tasks the detectives did at Burke's behest; and the remaining incidents involving Cuff, namely Cuff's four-rank demotion upon Burke becoming Chief of Department, and a separate instance in July 2015, when Burke sought someone to "take accurate attendance" at Cuff's retirement party to see who was friendly with Cuff and thus should be considered an enemy, MA-1408 to -09. We first conclude that admission of the party bag was not in error. On the other hand, we conclude that in certain instances, the district court erroneously admitted testimony regarding Burke's bad acts, but that such errors were ultimately harmless.

To begin, we conclude that evidence of Burke's "party bag" was admissible under Rule 403. The party bag and its contents provided context for Loeb's labeling of Burke as a "pervert," and for Burke's assault on Loeb. That context, in turn, was relevant to understanding the cover-up, as executed by Burke, Spota, and McPartland. Nor was the probative value of this evidence substantially outweighed by the risk of unfair prejudice toward Spota and McPartland, neither

36

of whom bore any relationship to the bag or its contents.   As such, we conclude the district court did not err in admitting this evidence.

Next, we consider the district court's admission of evidence concerning Cuff's demotion and retirement party as evidence of the co-conspirators' state of mind.   The logic underlying the district court's determination is sound: testimony involving particular events offered to explain the co-conspirators' fear of retaliation is not offered "to prove [the defendants'] character in order to show that on a particular occasion [the defendants] acted in accordance with the character," Fed. R. Evid. 404(b)(1), but rather, to demonstrate the basis for the co-conspirators' beliefs.   Accordingly, where the witness's fear of retaliation is relevant, as it is here for the reasons previously discussed, we have upheld district courts' decisions to admit a witness's testimony regarding past acts of reprisal that provide the foundation for his or her fear of the defendant.   *See, e.g.*, *Simels*, 654 F.3d at 168 ("The Court . . . did not err in admitting evidence about violence committed by gang members, evidence relevant to [the witness's] fear of reprisal."); *see also* 1 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 4:37 (4th ed.) ("Other acts by the defendant may explain the conduct of other people, apparently in reaction.   Often the proof shows threatening, violent,

or abusive behavior, which tends to prove fear on the part of victims or others, and knowing of that fear helps understand behavior that would otherwise be hard to decipher.").

As such, it was not error for the district court to permit Hickey and Leto to testify to their understanding that Burke demoted Cuff in retaliation for his role in the Rickenbacker investigation, and to permit Hickey to testify regarding the incident involving Cuff's retirement party. With regard to both of these witnesses, such testimony was offered as part of their explanations for why they feared retaliation from the administration—a point made clear by the district court's instructions that such evidence should be considered only "to the extent it relates to the state of mind of the alleged co-conspirators of the defendants." SA-513. For the same reasons, the testimony from Hickey, Bombace, and Leto about the various tasks the detectives performed for Burke—such as when Leto tailed the stepson of Burke's girlfriend or spied on the county executive—was admissible. By illustrating the detectives' willingness to follow Burke's orders, that evidence further highlighted their fear of retaliation from Burke and the rest of the administration.

But this accounts only for some of the testimony involving the Cuff incidents and Burke's other questionable acts that the district court permitted to come in. In addition to Hickey and Leto, four other witnesses—Dennis Sullivan, Stuart Cameron, John Meehan, and Cuff himself—testified about Burke's demotion of Cuff, even though their states of mind were not at issue. Similarly, in addition to allowing Bombace to testify about Burke's use of a GPS device to track a colleague, the court allowed Panchal, the individual who actually placed the device, to describe the incident. To be sure, such testimony may be admissible in some circumstances in order to bolster the reasonableness of the co-conspirators' fears by corroborating the events providing the foundation for their beliefs. *See United States v. Everett*, 825 F.2d 658, 660–61 (2d Cir. 1987) (explaining that evidence of "other crimes" is admissible to corroborate "crucial prosecution testimony," so long as the corroborating testimony is "direct and the matter corroborated is significant" (internal quotation marks omitted)). But in the present case, though this testimony may otherwise have been admissible, we conclude that it was needlessly cumulative and unfairly prejudicial. In particular, by permitting six witnesses to testify regarding the Cuff demotion—including Cuff himself and three other non-conspirators—whatever probative value came from the

corroboration of Hickey and Leto's fears was substantially outweighed by the potential prejudice associated with hearing again and again about Burke's history of vindictiveness.[9] The repetition of such testimony risked distracting the jury and transmogrifying the trial into a reckoning on Burke's character. Accordingly, the testimony of the non-conspirators regarding these incidents should have been excluded.

Nevertheless, we conclude that the district court's errors were harmless in light of the myriad other evidence presented at trial. "A district court's erroneous admission of evidence is harmless if the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury." *United States v. Al-Moayad*, 545 F.3d 139, 164 (2d Cir. 2008) (internal quotation marks omitted). In the harmless error analysis, we consider "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly

---

[9] The other two purposes for which the district court admitted this evidence—to illustrate motive by "show[ing] that defendants considered Burke's enemies to be their enemies," and to show the close relationship between Burke, Spota, and McPartland—do not alter our analysis. SPA-6. The evidence about Cuff's demotion and retirement party only marginally involves Spota and McPartland. Indeed, neither Spota nor McPartland figure in the testimony recounting Cuff's demotion, aside from their participation in the "demotion party," MA-1408, and neither Spota nor McPartland were mentioned at trial in relation to Cuff's retirement. In any case, either of these purposes would have been achieved by permitting only Hickey and Leto to discuss these events— not the various other witnesses.

admitted evidence; (3) the importance of the wrongly admitted evidence; and (4) whether such evidence was cumulative of other properly admitted evidence." *United States v. McCallum*, 584 F.3d 471, 478 (2d Cir. 2009) (internal quotation marks and alteration omitted). "We have frequently stated that the strength of the government's case is the most critical factor in assessing whether error was harmless." *United States v. Ramirez*, 609 F.3d 495, 501 (2d Cir. 2010).

Here, the government's case was strong. Hickey was no doubt a critical witness whose testimony, if believed, left "no question [that] both . . . defendants [were] guilty of each and every single offense in the indictment." MA-2043. But the government also presented other witnesses and evidence to corroborate Hickey's testimony. For example, phone records showed that multiple calls occurred between the phones attributed to Burke and McPartland, Burke and Hickey, and Burke and Madigan, on December 14, 2012, the day of the assault; and between the phones attributed to Spota and McPartland, Burke and Madigan, Spota and Madigan, McPartland and Madigan, Spota and Hickey, and Burke and Hickey, on June 25, 2013, the day of the subpoenas. Similarly, analysis of cellphone locations provided corroboration for meetings about which Hickey testified.

Additionally, testimony from multiple witnesses corroborated Hickey's account and, despite a lack of direct contact between these other witnesses and Defendants-Appellants, the testimony alluded to Spota and McPartland's presence and role in the cover-up. For example, Leto testified to his belief that Burke reported to Spota, MA-769, and he explained that he informed Hickey about his subpoena so Hickey "would pass it up the chain to Burke *and everybody else*," MA-784 (emphasis added). Hickey's role in the cover-up, Leto perceived, was to "pass[] . . . information back to Chief Burke *and all of them*." MA-846 (emphasis added). Bombace testified that there was "a seamless existence [between] the DA's office and the police department," MA-617, and he spoke of his fear that, if he were to cooperate with the federal investigation, he might be targeted "[b]y Chief Burke and his associates . . . [w]hat [he] perceived was the District Attorney's office, too," MA-625. And Craft, Burke's girlfriend, testified that in the summer of 2015, after the federal investigation was reopened, she heard Burke speak with McPartland over the phone about concerns that Hickey and Bombace "were talking about him." MA-1800 to -01. Together, all of this testimony

corroborated Hickey's account of the cover-up and strengthened the case against Spota and McPartland.[10]

Moreover, the evidence about Cuff's demotion and retirement party, as well as the detectives' "tasks," comprised only a small part of the government's case. In summation, the government specifically mentioned the demotion and the retirement party only once each, as examples of retaliation by Burke against an enemy; and in rebuttal the government made only one substantive reference to Cuff at all. Discussion of the tasks performed by the detectives was similarly brief. These remarks by the government could have been made based only on the properly admitted testimony from Hickey and Leto and, accordingly, could not have misled the jury. As a result, we conclude that although the admission of cumulative evidence regarding Cuff's demotion and retirement party, and the tasks performed for Burke, was in error, it was ultimately harmless.

---

[10] Some evidence pointed in the other direction. Constant testified that by 2012 Burke and Spota were not on good terms, making a coordinated cover-up less likely. *See* MA-1681. Still, the jury was entitled to discount that evidence and to credit Hickey's testimony and its corroboration.

## II. Application to Admit the Government's Bill of Particulars

Next, Spota and McPartland challenge the district court's denial of their application to admit the government's pre-trial bill of particulars. In summation, the government argued that the June 25, 2013 meeting attended by Burke, McPartland, Spota, Madigan, and Constant, as well as another meeting of the same group in October 2015, were evidence of the cover-up. Spota and McPartland subsequently sought to introduce the government's pre-trial bill of particulars, arguing that the government's purported position in summation—that Constant was a co-conspirator—was inconsistent with the bill of particulars, which did not list Constant among the list of co-conspirators. The district court denied the application, and in rebuttal, the government clarified it was not arguing that Constant was a co-conspirator. On appeal, Spota and McPartland repeat their arguments from trial.

As above, we review the district court's evidentiary rulings for abuse of discretion. *Litvak*, 889 F.3d at 67. We have previously stated that although bills of particulars "are not evidence in and of themselves," "a prior *inconsistent* bill of particulars [may] be considered an admission by the government in an appropriate situation," and may therefore be admissible under Rule 801(d)(2) of

the Federal Rules of Evidence. *United States v. GAF Corp.*, 928 F.2d 1253, 1260–62 (2d Cir. 1991) (emphasis added); *see also* Fed. R. Evid. 801(d)(2) (defining a statement made by an opposing party as "not hearsay"). The inconsistency should be clear on its face. *Cf. United States v. McKeon*, 738 F.2d 26, 33 (2d Cir. 1984) (explaining that when admitting a prior inconsistent *opening statement* under Rule 801(d)(2), the inconsistency "should be clear and of a quality which obviates any need for the trier of fact to explore other events").

Here, we discern no abuse of discretion in the district court's denial of the application to admit the bill of particulars. There was no "clear" inconsistency about Constant's status in the government's statements. *Id.* Indeed, there was no inconsistency at all, as the government did not state in its opening summation that Constant was a co-conspirator. Moreover, even assuming *arguendo* there was an inconsistency generated by the government's opening summation, the government's clarification in rebuttal obviated any need to admit the bill of particulars. Accordingly, we affirm the district court's denial of the application to admit the bill of particulars.

### III.    Rule 33 Motion

Finally, McPartland challenges the district court's denial of his request for an evidentiary hearing and new trial under Rule 33.   Following the verdict, McPartland filed a Rule 33 motion seeking a new trial on the current record or, alternatively, an evidentiary hearing to establish, *inter alia*, that Hickey testified falsely as to critical parts of his trial testimony and that the government knew or should have known the testimony was false.   The district court denied the motion.

We review the district court's denial of a motion under Rule 33 for abuse of discretion.   *United States v. Vinas*, 910 F.3d 52, 58 (2d Cir. 2018).

> A district court abuses its discretion in denying a Rule 33 motion when (1) its decision rests on an error of law or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions.

*Id.* (internal quotation marks and alteration omitted).   The district court itself "has broad discretion to decide Rule 33 motions based upon its evaluation of the proof produced."   *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995) (internal quotation marks omitted).   "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."   *United*

*States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). As we have explained, to grant a new trial pursuant to Rule 33, "[t]here must be a real concern that an innocent person may have been convicted." *Id.* (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).

Here, we discern no abuse of discretion in the district court's denial of McPartland's motion for a new trial and evidentiary hearing. It considered all the circumstances surrounding Hickey's testimony, including those McPartland raises now on appeal. For example, McPartland argues on appeal that Hickey's testimony regarding the February 2013 meeting—in which McPartland allegedly approved Burke's story that he merely "popped his head" into the interrogation room—was clearly false because there is no reference to this meeting in either the government's witness materials or Hickey's own notes. But the district court appropriately explained that the omission of the meeting from Hickey's calendar was "not dispositive." *See* MA-2116 to -17. Moreover, the district court's conclusion that Hickey's testimony was credible—and, at a minimum, not at the level of "patently incredible" required for a court to reject the jury's credibility determination, *Sanchez*, 969 F.2d at 1414—is located within the range of

47

permissible decisions and does not rest on an error of law or a clearly erroneous factual finding. *See* MA-2113 to -18.

Further, McPartland incorrectly interprets the district court as requiring newly discovered evidence in order to make a successful Rule 33 motion. The district court's reference to a lack of "newly discovered evidence" was merely to underscore the point that McPartland could have pressed his perjury arguments at trial; it did not *require* that he present new evidence. *See* MA-2120. Indeed, the district court expressly acknowledged that "Rule 33 does not require that a motion involve newly discovered evidence." MA-2120 n.8. Thus, the district court did not impose an erroneous burden on McPartland.

Finally, the district court did not abuse its discretion in finding that McPartland's failure to press his perjury argument at trial counseled against relief. McPartland claims that he could not have asserted this argument at trial because he would have had to call as a witness the prosecutor who was, at the time, trying the case, thus leading to her disqualification under the advocate-witness rule.[11] But as the district court correctly noted, McPartland could have called government

---

[11] *See* Model Rules of Pro. Conduct R. 3.7(a) (Am. Bar Ass'n 2020) ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness . . . .").

48

agents other than the prosecutor to testify about Hickey's disclosures to the government; and if he truly needed the testimony of the prosecutor, he could have requested a hearing outside the presence of the jury. *Cf. United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994) (explaining that in some circumstances, the trial court should undertake an independent *in camera* review of government files to determine materiality of the evidence). Accordingly, the district court did not abuse its discretion in denying McPartland his requested relief.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.