*United States v. O'Sullivan*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 2nd day of July, two thousand twenty-five.

Present:

> GERARD E. LYNCH,
> EUNICE C. LEE,
> MYRNA PÉREZ,
> *Circuit Judges.*

---

UNITED STATES OF AMERICA,

> *Appellee,*

v.

DONAL O'SULLIVAN, PADRAIG NAUGHTON, HELEN O'SULLIVAN,

> *Defendants-Appellants*.

---

Nos. 23-7076-cr (L);
23-7112 (CON);
23-7078 (CON)

For Appellee:

FRANK TURNER BUFORD, Assistant United States Attorney (Amy Busa, Meredith A. Arfa, Assistant United States Attorneys, *on the brief*), *for* Breon Peace,

United States Attorney for the Eastern District of New York, Brooklyn, NY.

For Defendant-Appellant Donal O'Sullivan: ALEXANDRA A.E. SHAPIRO (Theodore Sampsell-Jones, Alice Buttrick, *on the brief*), Shapiro Arato Bach LLP, New York, NY.

For Defendant-Appellant Padraig Naughton: NATHANIEL Z. MARMUR, The Law Offices of Nathaniel Z. Marmur, PLLC, New York, NY.

For Defendant-Appellant Helen O'Sullivan: JOHN D. CLINE, Law Office of John D. Cline, Seattle, WA.

Appeal from September 6, 2023 judgments of conviction of the United States District Court for the Eastern District of New York (Chen, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Defendants-Appellants Donal O'Sullivan ("Donal"), Helen O'Sullivan ("Helen"), and Padraig Naughton ("Naughton") (collectively, "Appellants") appeal from September 6, 2023 judgments of conviction for several felony counts—including conspiracy, mail and wire fraud, embezzlement from employee benefit funds, and filing false remittance reports—related to their affiliation with a company that schemed to avoid making required contributions to various unions' benefits funds. Donal and Naughton were sentenced to six months of incarceration followed by two years of supervised release. Helen was sentenced to two years of probation. The district court also imposed restitution of $1.276 million, holding Donal liable for the full amount and Helen

2

and Naughton jointly and severally liable for 30% of the restitution amount only in the event that Donal demonstrated an inability to pay the full amount.

On appeal, Appellants argue that their convictions must be reversed because: (1) the government produced insufficient evidence of knowledge and fraudulent intent at trial; (2) the district court erroneously admitted other acts evidence from a settled civil lawsuit; (3) the district court erroneously gave a conscious avoidance instruction; and (4) 18 U.S.C. § 664, which defines theft or embezzlement from an employee benefits plan, does not apply to their conduct.

## BACKGROUND

Donal was founder, owner, and president of Navillus Tile, Inc. d/b/a Navillus Contracting, a large construction company in New York City. He employed his sister, Helen, as Navillus's payroll manager, and Naughton as Navillus's comptroller. As a union company, Navillus entered into collective bargaining agreements ("CBAs") with multiple labor unions. In addition to paying their employees' hourly wages, Navillus was required, pursuant to the CBAs, to make contributions to the union benefits funds that were calculated based upon the number of hours Navillus employees spent performing work covered by the respective unions' CBAs ("covered work"), irrespective of whether the employees were union members.

Although Navillus primarily used its in-house payroll department to compensate its employees, for six years a portion of its payroll was run through D.E.M. Consulting, LLC d/b/a Allied ("Allied"), a third-party company that paid a total of 97 Navillus employees, including employees who did covered work. Donal had instructed Naughton to establish Allied with Kieran Lambe, a former consultant and subcontractor of Navillus. Navillus employees, including Helen and Naughton, shared with Allied on a weekly basis a list of Navillus employees that included the

3

hours employees worked, their respective wages, and their trade classifications. Allied paid the listed Navillus employees and invoiced Navillus for reimbursement and an additional fee for facilitating the payroll compensation. Navillus made no contributions to the union benefits funds for the Navillus employees paid by Allied. Trial evidence later established that the invoices Allied sent Navillus for the reimbursement falsely indicated that Allied provided masonry or consulting services to Navillus, rather than payroll processing services. The Allied checks dispersed to the respective Navillus employees were signed by either Donal or Helen.

Donal, Helen, and Naughton were indicted on July 29, 2020, and charged with conspiracy to commit mail and wire fraud, 18 U.S.C. § 1349 (Count One); substantive mail and wire fraud, 18 U.S.C. §§ 1341 and 1343 (Counts Two through Seven); conspiracy to embezzle from employee benefits funds, 18 U.S.C. § 371 (Count Eight); substantive embezzlement from employee benefits funds, 18 U.S.C. § 664 (Count Nine); conspiracy to file false remittance reports, 18 U.S.C. § 371 (Count Ten); and filing false remittance reports, 18 U.S.C. § 1027 (Count Eleven). Following a seventeen-day trial, a jury convicted Donal, Helen, and Naughton on all counts. This appeal followed.

We assume the parties' familiarity with the remaining underlying facts, the procedural history, and the issues on appeal.

## DISCUSSION

### I. Sufficiency of the Evidence

We review challenges to the sufficiency of the evidence and questions of statutory interpretation *de novo*. *See United States v. Raniere*, 55 F.4th 354, 360, 363–64 (2d Cir. 2022). We "sustain the jury's verdict if, crediting every inference that could have been drawn in the

4

government's favor and viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*" *Id*. at 364 (alterations adopted) (quoting *United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021)). Additionally, we "analyze the evidence in conjunction, not in isolation, and apply the sufficiency test to the totality of the government's case and not to each element, as each fact may gain color from others." *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020) (internal quotation marks and citations omitted). Generally, "[d]irect evidence is not required; in fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (alteration adopted and internal quotation marks omitted). "We may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Raniere*, 55 F.4th at 364 (internal quotation marks omitted). We consider each of the Appellants' claims about the insufficiency of the evidence in turn.

Donal argues that the government's circumstantial evidence failed to prove beyond a reasonable doubt that he had the requisite knowledge and intent to wrongfully withhold payments to the benefits plans because there was evidence suggesting that he did not know that Allied workers performed covered work. Donal cites to the difficulty of determining what work was covered and the fact that he did not assign individual employees to jobs, and thus would not know whether they were performing covered work. Donal argues that because the evidence proffered

5

by the government could equally or near-equally support a theory of guilt or innocence, the government failed to meet its burden of proof. We disagree.

There was sufficient circumstantial evidence to prove that Donal knew that at least *some* Allied-paid Navillus employees were performing covered work without Navillus making corresponding contributions to the union benefits funds. First, in Donal's deposition testimony from *Moore v. Navillus Tile, Inc.*, No. 14-CV-8326 (S.D.N.Y.), a separate civil case from which evidence was admitted at the criminal trial, he stated under oath that he had not "ever used an outside payroll company to process [Navillus's] payroll" and that while he had heard of Allied, he did "not recall using [Allied] to process payroll to pay employees." Joint App'x at 834-36; *see generally Moore v. Navillus Tile*, *Inc.*, 276 F. Supp. 3d 110 (S.D.N.Y 2017).[1] However, at the time of Donal's deposition in January 2015, Navillus had issued well over 200 checks to Allied since February 2011, approximately 78 of which bore Donal's signature. The jury heard testimony from Lambe about Donal's role in the creation of Allied's relationship with Navillus. Additionally, the jury saw a September 2011 email Donal sent to Lambe acknowledging that although Lambe's consulting work with Navillus was complete, Navillus would "continue with the weekly arrangement we have with your company," an apparent reference to Allied's payroll services. Joint App'x at 522. Viewing "the evidence in conjunction, not in isolation," the

---

[1] In *Moore*, the trustees of four groups of multi-employer fringe benefit funds argued that three non-union companies owed union benefits for work performed by their employees because those companies were in fact "alter egos" of Navillus, which was bound by collective bargaining agreements with various unions to make such benefits payments on behalf of its employees. 276 F. Supp. 3d at 115, 119-123, 144. Following a bench trial, the district court concluded that the three companies *were* alter egos of Navillus and that Navillus and the companies accordingly owed the benefits payments. *Id.* at 165-67. While an appeal was pending, the parties settled, and the district court vacated its judgment and underlying findings. *Moore v. Navillus Tile Inc.*, No. 14-CV-8326, 2018 WL 7048697, at *1 (S.D.N.Y. Oct. 26, 2018).

6

"totality of the government's case" permitted the jury to reasonably infer that Donal had the requisite knowledge and intent. *Atilla*, 966 F.3d at 128 (internal quotation marks omitted).

Helen, who was responsible for Navillus's payroll, argues that the evidence against her was insufficient because the jury could not reasonably infer that she knew of the criminal scheme and intended to participate. Helen notes that the CBAs were difficult to understand, that not all covered work required Navillus to contribute, seeing as certain CBAs stated that benefits contributions were not required for work in excess of 40 hours, and that she did not have knowledge of the relevant agreements or the amount of work employees performed, given that she never visited Navillus's yard or job sites throughout the city.

There is substantial evidence that Helen knowingly and intentionally played a critical role in facilitating Navillus's and Allied's relationship, as well as the scheme to avoid contributions to the benefits funds. First, like Donal, Helen had signatory authority for Navillus's bank accounts, and 233 checks, totaling over $6 million, bore Helen's signature and were paid to Allied from February 2011 through December 2016. Second, Helen signed periodic remittance reports on behalf of Navillus, which were sent to the benefits funds of various unions that purported to identify all covered employees, their positions, the number of hours each employee had worked that week or month, and a calculation of the associated contributions to the benefits funds. Thus, Helen was aware of the requirement to submit remittance reports, yet made no reports for employees paid through Allied. Lastly, the jury heard evidence that in December 2016, Lambe abruptly informed Navillus via email that Allied would no longer provide payroll services. In response, Helen wrote personal checks, totaling over $50,000, to cover the wages of five employees formerly paid through Allied, instead of processing the employees' pay through

7

Navillus's payroll. Because "[d]irect evidence" of Helen's knowledge of or intent to participate in the criminal scheme "is not required," the jury could reasonably infer through circumstantial evidence that Helen paid the Allied-paid employees personally in order to facilitate the criminal scheme to avoid making contributions to the benefits plans. *Lorenzo*, 534 F.3d at 159.

Lastly, Naughton argues that there was insufficient evidence to suggest that he intended to participate in the scheme because he did not draft, negotiate, or implement the CBAs and had no knowledge of which Allied-paid Navillus employees performed covered work, given that the payroll forms listed trade classifications only. Additionally, Naughton argues that he did not financially benefit from the Allied payroll arrangement and that his failure to provide the Allied payroll to union auditors, as required by the CBAs, is not indicative of his intent to defraud.

Despite Naughton's attempt to downplay his role in the criminal scheme, the jury could reasonably infer that he had the requisite knowledge and intent. According to Lambe, Naughton directed Lambe on how to set up Allied to provide payroll services to Navillus. Naughton himself sent Lambe several of Navillus's weekly payroll sheets and thereafter was copied on a year's worth of communications attaching such payroll sheets. He also worked closely with insurance brokers to obtain insurance for the employees paid by Allied, which he misrepresented to the insurance companies as a tile/masonry contractor rather than a payroll service. Additionally, the jury heard evidence that when Allied paid the Navillus employees and sent Navillus invoices for reimbursement, Naughton instructed Lambe not to include descriptions on the invoices. Because Naughton failed to inform the union auditors of the existence of Allied for the entire six-year period of the scheme, the auditors had no reason to believe that Navillus was outsourcing payroll to another company for workers who were potentially performing covered work.

8

Because "each fact may gain color from others," *Atilla*, 966 F.3d at 128 (quoting *United States v. Riggi*, 541 F.3d 94, 108 (2d Cir. 2008)), Naughton's concession that he created Allied with Lambe, along with the aforementioned evidence, was sufficient to allow a reasonable inference of Naughton's knowledge and intent. We have held that our deference to a jury's verdict is "especially important" in a conspiracy case "because a conspiracy by its very nature is a secretive operation." *United States v. Anderson*, 747 F.3d 51, 72–73 (2d Cir. 2014) (quoting *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992)). In light of that deference—and the evidence reviewed above—we see no reason to disturb Naughton's conviction here.

## II. Other Acts Evidence

This Court reviews "evidentiary rulings for abuse of discretion and will disturb an evidentiary ruling only where the decision to admit or exclude evidence was manifestly erroneous." *United States v. McPartland*, 81 F.4th 101, 114 (2d Cir. 2023) (internal quotation marks omitted). "Even if a decision was manifestly erroneous, we will affirm if the error was harmless." *United States v. Litvak*, 889 F.3d 56, 67 (2d Cir. 2018) (internal quotation marks omitted). "To determine whether a district court properly admitted other act evidence, the reviewing court considers whether (1) it was offered for a proper purpose; (2) it was relevant to a material issue in dispute; (3) its probative value is substantially outweighed by its prejudicial effect; and (4) the trial court gave an appropriate limiting instruction to the jury if so requested by the defendant." *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004). "The district court abuses its discretion when it admits other act evidence with a high possibility of jury misuse but

9

with only slightly more probative value than other evidence on the same issue." *United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) (internal quotation marks omitted).

Donal argues that the admitted other acts evidence—evidence from the *Moore* case of Navillus evading contribution to union benefits funds by creating and using alter-ego companies to pay its employees—was forbidden propensity evidence. The district court initially rejected the government's request to admit the evidence as probative of Appellants' knowledge and intent upon entering into Navillus's business arrangement with Allied. However, the court later ruled that Appellants had opened the door to the evidence's admission by seeking to introduce evidence of Navillus's many contributions to union benefits funds, in order to show lack of motive to avoid payment of the comparatively minor contributions avoided through the Allied arrangement. Appellants additionally argue that the government failed to establish the relevance of the civil litigation, given that (1) the alter ego companies at the center of the *Moore* litigation were not implicated in the charges nor related to Allied, and (2) the claims in the civil litigation were based on Navillus's failure to treat these non-union, alter ego companies that were closely affiliated with them as bound by the CBAs, rather than an allegation of Navillus failing to pay the union benefits funds.

Appellants' arguments are unpersuasive. Contrary to Appellants' claim that the evidence from the civil litigation was offered as propensity evidence, once the defense decided to introduce evidence of Navillus's total contributions to the relevant benefits funds, the district court acted within its discretion in permitting the government to introduce the otherwise arguably inadmissible evidence for the limited purpose of rebutting Appellants' argument that they lacked the requisite fraudulent intent. *See* Special App'x at 58 (district court finding that "[b]y seeking to argue a lack

10

of criminal intent based on the magnitude of the contributions Navillus made compared to the magnitude of the contributions it avoided through the alleged payroll scheme, Defendants made the evidence . . . plainly relevant and . . . probative of knowledge and fraudulent intent as to the alleged scheme"). In light of Appellants' claim that they would not have sought to avoid contributing the amount at issue because of the contributions Navillus did make, the civil litigation is probative of Appellants' knowledge and intent because it supported the opposite inference— that is, that Navillus's failure to make benefits contributions was not inadvertent or an innocent mistake. Further, the risk of any prejudicial effect was mitigated by the district court's instruction limiting the government's presentation of this evidence to a summary of the Allied-paid employees who were *also* compensated by the alter ego companies in the civil litigation. *See McPartland*, 81 F.4th at 114 (explaining that this Court accords "great deference to a district court in ruling as to the relevancy and unfair prejudice of proffered evidence" (quoting *United States v. Paulino*, 445 F.3d 211, 217 (2d Cir. 2006)).

Lastly, both Helen and Naughton argue the other acts evidence was particularly prejudicial toward them, given that (1) they were not ultimately parties to the civil litigation or associated with the alter ego companies;[2] and (2) the government waited until its rebuttal summation to rebut their innocent mistake defense by associating them with the scheme in the civil litigation. But Helen and Naughton benefitted from the defense's door-opening evidence that Navillus made many of the required contributions. Also, as the district court noted, Helen and Naughton were free to

---

[2] As the district court in the civil litigation noted in its initial judgment following a bench trial, "Helen . . . was initially named as an individual Defendant to this action, but Plaintiffs withdrew all claims against her during trial. Helen . . . has never had an ownership interest in, or control over, Navillus" or the alter ego companies. *Moore*, 276 F. Supp. 3d at 117.

counter any potential prejudice by arguing that they were not involved in the related companies. Furthermore, the record belies both Appellants' contention that they were not aware of the essence of the government's use of this evidence until the rebuttal. The government referenced the related companies' evidence in its initial summation, placing them on notice of its intended use. *See* Trial Tr. at 3115 (government summation noting Naughton had repeatedly denied to auditors that Navillus used a payroll master or had "affiliated companies"), *id.* at 3125 (noting Navillus employees "who were paid through different companies for Navillus work"); *see also* Mem. & Order, Dist. Ct. Dkt. 265 at 32 (ruling on motions *in limine* to allow the government to present alter-ego evidence at trial "in summary form and limited to the Navillus employees who were paid through the scheme alleged in this case").[3] Thus, the district court did not err in admitting the other acts evidence.

Even assuming, arguendo, that the evidence was admitted in error—which it was not—its admission would have been harmless. *See McPartland*, 81 F.4th at 121 ("A district court's erroneous admission of evidence is harmless if the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury."). As discussed above, pp. 5–10, there was ample evidence, independent of the other acts evidence, to convict the Appellants.

---

[3] We note again that the district court permitted introduction of limited evidence from the civil litigation only insofar as it involved the subset of employees of the alter ego companies who were also paid through Allied. This evidence is plainly relevant after the Appellants opened the door to it, since Helen and Naughton were the individuals responsible for sending Allied weekly emails naming employees whom Allied should pay. *See United States v. Edwards*, 342 F.3d 168, 177 (2d Cir. 2003) (requiring "similarity or tangible connection between" the other acts evidence and the case at hand).

### III. Conscious Avoidance Instruction

Appellants argue that a conscious avoidance instruction should not have been given to the jury because the government's theory at trial was not that each defendant willfully avoided knowledge of the criminal scheme, but rather that each defendant had actual knowledge of and intentionally engaged in the fraudulent scheme.

"[A] conscious avoidance instruction may be given only (i) when a defendant asserts the lack of some specific aspect of knowledge required for conviction, and (ii) the appropriate factual predicate for the charge exists, *i.e.*, the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003) (internal citations and quotation marks omitted).

Donal argues that there was no basis for the jury to infer that he made an effort to avoid learning what work a handful of workers on the Allied payroll were engaged in, much less whether their work was covered by CBAs. We disagree because both requirements for a conscious avoidance instruction were satisfied. First, Donal had claimed that he was unaware of the fraudulent scheme. Second, as described above, the government introduced evidence that Donal had been aware of the high probability of Allied's failure to pay into the benefits funds. A jury could reasonably infer that Donal avoided confirming this fact by deploying Naughton to set up Allied with Lambe, thereby "insulat[ing] himself from discussions which he knew would involve direct acknowledgment of [Navillus employees performing covered work]." *United States v. Wedd*, 993 F.3d 104, 119 (2d Cir. 2021). The government also called as one of its witnesses an employee who testified that he expressed to Donal a desire to join a union and complained about

13

Allied issuing him checks in the name of Donal's brother-in-law and using Donal's own personal address.  At a minimum, this evidence suggests that Donal consciously avoided asking about how someone engaged in covered work was being paid through Allied using a fraudulent name.

Helen argues that the evidence supporting the conscious avoidance instruction as to her was non-existent and that the colloquy between the prosecutor and the district court, in which the court stated that conscious avoidance "[wa]s proved, to some extent by [Helen] never asking questions" about whether the employees were performing covered work, reflected two errors: (1) the district court assumed that she did not ask questions, though there was no evidence that she remained silent, and (2) the district court conflated conscious avoidance with negligence or recklessness because it did not have evidence that she actively decided to not learn a key fact. Special App'x at 66.

We are not persuaded by Helen's contention that the district court's comments indicate that it relied on an improper basis to admit the evidence.  As explained above, the factual predicate— that Helen knew that covered work was being performed—was proven with circumstantial evidence.  *See Aina-Marshall*, 336 F.3d at 171 (explaining that a factual predicate exists where a rational juror can infer that there was a high probability that the defendant was aware of the fact in dispute and consciously avoided learning that fact); *see also United States v. Kozeny*, 667 F.3d 122, 134 (2d Cir. 2011) ("It is not uncommon for a finding of conscious avoidance to be supported primarily by circumstantial evidence.").  Additionally, the district court did not conflate conscious avoidance with negligence or recklessness.  *See* Joint App'x at 505 (instructing the jury that "[t]he [g]overnment does not meet its burden of proving knowledge by demonstrating that the [d]efendant[s] w[ere] merely negligent or foolish"); *id*. at 873 (same).  Instead, it accurately

14

determined that a rational jury could conclude, based on the available facts, that Helen was aware of circumstances regarding the Allied payroll arrangement that were so suspicious that any lack of knowledge on her part was deliberate.

A host of facts supported that determination. First, Navillus had an internal payroll department—which Helen managed—that was capable of running employees' payroll. Second, running payroll through Allied was costly, inefficient, and inconvenient for Navillus and in particular for Helen. Third, Navillus had obligations to pay union benefits for certain work performed by its employees—work which was tracked and reported to the unions in remittance reports Helen herself signed. Fourth, those remittance reports did not disclose work performed by the employees paid through Allied, even though the trades listed on their payroll reports, which Helen also transmitted, aligned with trades covered by the CBAs. And fifth, it was sufficiently important that those employees not be paid through Navillus's internal payroll department that when Lambe announced he would no longer participate in the scheme, Helen wrote personal checks weekly for over five months to cover over $50,000 worth of payroll for those employees rather than adding them to Navillus's books. Given those facts, we agree that a rational juror could "reach the conclusion beyond a reasonable doubt that [Helen] was aware of a high probability" that the Allied arrangement was intended to avoid Navillus's CBA obligations and that she at a minimum "consciously avoided confirming that fact." *Aina-Marshall*, 336 F.3d at 170.

Lastly, Naughton argues that the jury could not rationally conclude that he consciously avoided learning of the fraudulent scheme because: (1) the government's theory was that he had orchestrated the fraud and thus possessed actual knowledge, and (2) his defense was that he

15

believed the payroll arrangement was legitimate, and thus he had no knowledge of the scheme. To begin, the government is free to argue that a defendant either possessed actual knowledge of a scheme, or in the alternative, consciously avoided confirming a suspicion, despite awareness with a high probability, that his conduct was illegal. *See United States v. Carlo*, 507 F.3d 799, 802–03 (2d Cir. 2007); *United States v. Hopkins*, 53 F.3d 533, 542 (2d Cir. 1995). Moreover, here, a rational jury could have found that Naughton lacked actual knowledge and did not inquire about whether the Navillus employees on Allied's payroll were in fact performing the trade work listed in the payroll sheets because he did not want to know whether contributions were owed. Naughton *knew* that the Allied payroll was used to pay Navillus employees and personally undertook significant effort to set up the arrangement, and Naughton was sent and copied on the payroll sheets establishing that workers performed trade work that was covered by the CBAs. That, alone, created suspicious circumstances such that the failure to question them could constitute a deliberate effort to avoid knowledge.

Nevertheless, even assuming that the factual predicate for the instruction did not exist, any error in giving the conscious avoidance instruction was harmless because the jury was charged on actual knowledge and, as explained above, there is overwhelming evidence that supports that Donal, Helen, and Naughton knew that employees on Allied's payroll performed covered work. *See United States v. Ferrarini*, 219 F.3d 145, 154–57 (2000) (explaining that although the conscious avoidance instruction was erroneous, there was ample evidence of actual knowledge, and therefore the error was harmless).

16

**IV. Embezzlement under 18 U.S.C. § 664**

Finally, Appellants argue that their convictions on Counts Eight and Nine of the indictment, conspiracy to embezzle and embezzlement from employee benefits funds, respectively, should be reversed because the government failed to prove embezzlement of plan "assets." They contend that embezzlement under 18 U.S.C. § 664 requires conversion but the contractual right, as provided in the CBAs, to collect benefits, although an asset, cannot be converted. Because the government charged Appellants specifically with embezzling "the right to collect monies owed to Benefit Funds," and not embezzling union funds, which can be converted, Appellants argue that their conduct cannot be a violation of 18 U.S.C. § 664.[4]

"[A] federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012); *see* Fed. R. Crim. P. 12(b)(3)(B)(v). A district court's denial of a motion to dismiss an indictment presents a mixed question of law and fact and is reviewed *de novo*. *United States v. Montague*, 67 F.4th 520, 527 (2d Cir. 2023).

Section 664 states:

> Any person who embezzles, steals, or unlawfully and willfully abstracts or *converts* to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan . . . shall be [fined or imprisoned].

18 U.S.C. § 664 (emphasis added). The indictment in this case charged Appellants with unlawfully converting to their own use or the use of others "the right to collect monies owed to the

---

[4] Helen and Naughton adopt Donal's arguments on this issue.

Benefits Funds" as a "credit[], property [or] other asset[]" of the funds and conspiring to do the same.   Joint App'x at 68–70.

We disagree with Appellants' contention that the right to collect cannot be the subject of embezzlement or conversion under Section 664 because the right to collect cannot be converted. This Court assumes that the ordinary meaning of statutory language accurately expresses Congress's legislative purpose.  *See Aleynikov*, 676 F.3d at 76.   Black's Law Dictionary defines conversion as "an act or series of acts of willful interference, without lawful justification, with an item of property in a manner inconsistent with another's right, whereby that other person is deprived of the use and possession of the property."  *Conversion*, Black's Law Dictionary (12th ed. 2024).   We have adopted this ordinary meaning in a case analogous to the case at bar, implicitly concluding that the right to collect benefits contributions is a convertible asset within the meaning of Section 664.  *See United States v. LaBarbara*, 129 F.3d 81, 88 (2d Cir. 1997) ("LaBarbara's acquiescence in the use of [a separate corporation] as a vehicle to *convert* [the contractual obligations to contribute to funds] and to conceal [the employer's] contractual obligations [under its CBA] aided or abetted a violation of Section 664.") (emphasis added). Here, Appellants' involvement in the fraudulent scheme, which permitted Navillus to evade paying money that was owed to the benefits funds, was a willful interference with the benefits funds' "right to collect monies owed" from Navillus, Joint App'x at 68–70, and therefore constitutes the unlawful conversion of an asset under Section 664.

And contrary to Appellants' assertion, nothing in *In re Halpin*, 566 F.3d 286 (2d Cir. 2009), compels a different result.  *Halpin* was a civil bankruptcy case in which we interpreted the term "assets" in a substantive ERISA provision, as compared to the use of that word in the criminal

18

prohibition in Section 664.  We held that "assets" under the ERISA statute does not include any contributions to benefits funds that an employer has yet to pay.  *Id*. at 290.  We explained in that case that *LaBarbara* stands in no "tension" with such an analysis, because *LaBarbara* allows criminal liability to attach under Section 664 when an individual has deprived a union of the *contractual right* to receive unpaid contributions, which we characterized as the relevant asset under the criminal statute (as opposed to the unpaid funds themselves).  *Id*. at 291.

Thus, we affirm Appellants' convictions on Counts Eight and Nine.

*          *          *

We have considered Appellants' remaining arguments and find them to be without merit. For the reasons stated above, we **AFFIRM** the judgment.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

19